## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRELL WILLIAMS, | JURY TRIAL DEMANDED |
| Plaintiff, | Civ. No. _____ |
| v. | |
| BENE MARKET, LLC, ALAN REDMOND, and WILLIAM CORCHADO, JR. | |
| Defendants. | |

## COMPLAINT

Plaintiff, Terrell Williams, by his counsel, Mobilio Law, LLC and Law Office of Peter C. Wood, Jr., PC, brings this action against Defendants, Bene Market, LLC, Alan Redmond and William Corchado, Jr.  Plaintiff alleges upon knowledge as to himself and his own acts, and otherwise upon information and belief, as follows:

## INTRODUCTION

1.     Plaintiff brings the instant action to redress harm caused by Defendants' violations of his rights as secured by 42 U.S.C. § 1981.

2.      Specifically, shortly after he was hired by Defendant Bene Market, LLC, he was subjected to numerous racial slurs by Defendant William Corchado, Jr. due to his African American race, including, but not limited to:

a)      "nigger";

b)      "bum ass nigger";

c)      "broke ass nigger"; and

d)      "boy".

3.      Mr. William complained on several occasions to his Hispanic and white supervisors and managers, and eventually directly to the company's founder and owner, Defendant Alan Redmond, about Mr. Corchado's hate speech in the workplace, but Mr. Redmond and the company refused to correct the misconduct.

4.      Moreover, the discriminatory treatment endured by Mr. Williams was entirely preventable, as the company and Mr. Redmond had long been on notice of Mr. Corchado's bigotry in the workplace due to a series of complaints lodged by another African American employee against Mr. Corchado.

5.      Eventually, after several complaints to his supervisors, Mr. Williams could no longer tolerate the discriminatory treatment and resigned.

6.      As a result of Defendants' callous disregard for Plaintiff's rights, Plaintiff has been harmed.

## PARTIES

7.      Plaintiff Terrell Williams ("Plaintiff" or "Mr. Williams") is an adult individual residing at 624 S. 10th Street, Reading, PA 19605.

8.      Defendant Bene Market, LLC ("Defendant Bene Market" or the "Company") is a business organization headquartered at 4 S. 4th Street, Reading, PA 19605.

9.      Defendant Alan Redmond ("Defendant Redmond") is an adult individual with a principal business address of 4 S. 4th Street, Reading, PA 19605, and is the founder and owner of Defendant Bene Market.

10.     Defendant William Corchado, Jr., ("Defendant Corchado") is an adult individual with a principal business address of 4 S. 4th Street, Reading, PA 19605.

11.     At all times relevant and material herein, Defendant Bene Market acted by and through its agents, servants, and employees, each of whom acted in the course and scope of their employment with and for the Company.

12.     At all times relevant and material herein, Defendants Redmond and Corchado were agents, servants, and/or employees of Defendant Bene Market and were authorized to act on its behalf.

3

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action in accordance with 28

U.S.C. § 1331 because this civil action arises under a law of the United States and

seeks redress for violations of a federal law.

14.     This Court may properly maintain personal jurisdiction over

Defendants because Defendants' contacts with this Commonwealth and this

judicial district are sufficient for the exercise of jurisdiction over Defendants to

comply with traditional notions of fair play and substantial justice.

15.     Venue is properly laid in this judicial district pursuant to

28 U.S.C. § 1391, as a substantial part of the acts or omissions giving rise to the

claims alleged herein occurred within this judicial district, and Defendants are

subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

16.     Plaintiff is an African American male.

17.     Plaintiff was hired by Defendant Bene Market as a Qualifying

Specialist in September of 2019.

18.     Mr. Williams was one of the few African American employees at the

Company.

19.     Shortly after he was hired, Mr. Williams was subjected to numerous racial slurs by Defendant Corchado, who was a supervisor for the Company, including, but not limited to:

    a)     "nigger";

    b)     "bum ass nigger";

    c)     "broke ass nigger" and

    d)     "boy".

20.     In or around the middle of September 2019, Mr. Williams was on the phone with a potential client when he approached Defendant Corchado for assistance.

21.     When Mr. Williams began to speak to Defendant Corchado, Defendant Corchado said, "***Shoo boy, go the fuck over there, you making too much noise***."

22.     There were numerous other employees present who witnessed the incident.

23.     As a result of being called "boy", Mr. Williams made a complaint to the Company's Chief Financial Officer, Brent Furrie.

24.     Mr. Furrie then directed Defendant Corchado to apologize to Mr. Williams, but did not initiate any other discipline.

25.     A short time later in September, Defendant Corchado called Mr. Williams and numerous fellow employees into a meeting to discuss sales techniques.

26.     Mr. Williams raised his hand to offer a comment and, in response, Defendant Corchado told Mr. Williams, "Shut the fuck up, I don't want to hear shit from you".

27.     Later in that same meeting Mr. Williams again raised his hand to offer a comment and, in response, Defendant Corchado yelled, "***Shut the fuck up nigger!***"

28.     The following morning, Mr. Williams was walking toward his desk when he was confronted by Defendant Corchado.

29.     In the immediate vicinity of the two men sat "Sarah", the Company's head of Human Resources, as well as 30-40 employees.

30.     Defendant Corchado began yelling at Mr. Williams and screamed, "***Get this bum ass nigger out of here!  I don't want him on the floor!***"

31.     "Sarah" then intervened, attempting to calm Defendant Corchado down.

32.     Eventually, Mr. Furrie intervened and told Mr. Williams to take the day off and to return to work the next day to meet with the owner of the company, Defendant Redmond.

33.     The following day, Mr. Williams appeared for the meeting with Defendant Redmond, Mr. Furrie and Defendant Corchado.  No representative from Human Resources was present.

34.     At this meeting, Defendant Redmond advised Mr. Williams that Defendant Corchado "didn't mean it," and defended him stating, "He's just very passionate about his work".

35.     Defendant Redmond then advised Mr. Williams that he was doing a great job, that he was the "top qualifying specialist in the company," and that he would soon be offering Mr. Williams a management position.

36.     Defendant Corchado then apologized to Mr. Williams, although Mr. Williams perceived the apology to be coerced and not sincere.

37.     On the morning of December 2, 2019, Mr. Williams was having difficulty with his son who suffers from hyper aggression disorder.

38.     Although Mr. Williams was able to attend work, when Mr. Williams arrived at work, he advised his direct supervisor, Mr. McDonald, and another supervisor, "Joe", that he needed to leave to care for his ill child.

39.     Mr. Williams was advised that there was no issue with him leaving.

40.     As Mr. Williams was leaving the office, he ran into Mr. Furrie, and began speaking to him.

41.     Suddenly, Defendant Corchado leaped over his desk and began running toward Mr. Williams.

42.     Defendant Corchado also started yelling, "Where the fuck are you going?  You going to disrespect me like this?"

43.     Mr. Williams then told him that he was leaving to care for his son.

44.     Defendant Corchado responded, "Fuck your kids, fuck your family, fuck your life!  I don't give a fuck about anything but what happens in this building!"  Defendant Corchado continued his rant, screaming,  "***Fuck you, you're nothing but a broke ass nigger!***"

45.     Mr. Furrie then separated the two men and Mr. Williams left the office.

46.     A few minutes later, Mr. Williams received a phone call from the Company's in-house counsel, Katherine Downing, Esq., and Human Resources representative, Tay Benson.

47.     Ms. Downing advised Mr. Williams that what Defendant Corchado said was not acceptable, but that Defendant Corchado merely needed some "sensitivity training," and that Mr. Williams would be moved to a different department.

48.     Ms. Downing requested that Mr. Williams come to the office the following day to speak with Sarah, the head of HR, and Mr. Furrie, which he did.

49.     During that meeting, Mr. Williams was advised by Sarah that Defendant Corchado "didn't mean it" and that he "really likes you".

50.     Mr. Williams was also advised that the Defendant Bene Market's owner, Defendant Redmond, refused to move Mr. Williams to a new department, for the stated reason that Mr. Williams and Defendant Corchado "make too much money for the company together".

51.     The working conditions at the Company had become so intolerable that Mr. Williams felt compelled to, and did, resign.

52.     Unbeknownst to Mr. Williams at the time of his hire, Defendant Redmond, as well as the Company's senior management and Human Resources department, had a history of willfully turning a blind eye towards Defendant Corchado's bigotry and other discriminatory conduct in the workplace.

53.     In December 2018, the Company hired Darryl Wynn, as a Licensed Sales Agent.

54.     As soon as Mr. Wynn began his employment, he was inundated with racial epithets and slurs.

55.     Specifically, Defendant Bene Market maintained an in-office audio system that broadcast music throughout the Company's office.

56.     Defendant Bene Market's white employees' music of choice to be pumped through the office was racially-charged hip-hop music that contained

offensive lyrics including the words, "nigger", "nigga", "bitch", "hoe", and other such language.

57.     The music played all day, every day.

58.     Almost immediately, Mr. Wynn lodged a complaint with Arthur Walsh, the Company's Chief Operating Officer, who advised that he would discuss the matter with the owner, Defendant Redmond.

59.     Soon thereafter, Mr. Walsh advised Mr. Wynn that Defendant Redmond would not authorize the change in music, as the racially charged hip-hop helped "hype up" the employees.

60.     On January 28, 2019, Mr. Wynn and other salespeople were in a weekly meeting discussing their progress.

61.     Mr. Wynn was asked how things were going, in general, to which he responded that he was disturbed by the conduct of Defendant Corchado (who had not yet been promoted to manager and was a sales associate just as Mr. Wynn).

62.     Specifically, Mr. Wynn complained that Defendant Corchado would frequently scream and yell on the floor and it made it difficult for Mr. Wynn to hear clients on the phone.

63.     Defendant Corchado, who was present at this meeting, started screaming and cursing at Mr. Wynn.

64.     Mr. Wynn responded, "Who are you talking to like that?" to which Defendant Corchado responded, "***I'm cursing at you, you fucking nigger***".

65.     In response, two upper management employees, "Joe" and "Jesus", who were present, stood up and demanded that Defendant Corchado apologize.

66.     Defendant Corchado replied, "I'm not apologizing" and then left the meeting.

67.     Thereafter, Mr. Wynn spoke to Mr. Walsh and asked him if he was aware that Defendant Corchado called him a "nigger".

68.     Mr. Walsh acknowledged that he was aware of the incident.

69.     Mr. Wynn then asked what Mr. Walsh intended to do about it, to which Mr. Walsh responded, "I asked him to apologize, but he refused.  Off the record, you should beat his ass outside, but not in the building or you might be arrested".

70.     Mr. Wynn replied that if Mr. Walsh would not take action, he would like to make a formal complaint to human resources, to which Mr. Walsh replied, "You can do so, but we don't have a plan or policy in place to deal with discrimination".

71.     Dejected by the lack of company response, Mr. Wynn went home and did not return for one (1) week.

72.     During his one (1) week hiatus, he was contacted by Mr. Walsh and asked to come back to the job, which Mr. Wynn did, reluctantly.

73.     When he returned, Mr. Wynn was advised that Defendant Corchado received a short suspension, without pay, as a result of his use of the slur "nigger" directed at Mr. Wynn.

74.     However, Mr. Wynn was also advised that Defendant Corchado, upon returning from his suspension, had received a raise and promotion, *and had become Mr. Wynn's direct supervisor*.

75.     When Mr. Wynn later brought his concerns to the Company's in-house counsel, Ms. Downing, that Defendant Corchado was essentially being rewarded for calling him a "nigger", Ms. Downing responded in an e-mail that:

> It's my understanding that when the racial slur was made, the person who made the slur was reprimanded, admonished and sent home without pay for two days… It is my understanding this person was later promoted based on merit, not for use of a racial slur… The decision to promote the employee was made by upper management during a performance review and was based on this person's high sales.

76.     After a short period serving under Defendant Corchado, during which time he witnessed Defendant Corchado discussing the skin color of other employees and having a conversation with another employee about the employee's grandmother "hat[ing] black people," and additionally after Defendant Corchado

stopped providing Mr. Wynn with leads so that he could generate sales, Mr. Wynn requested that he be transferred to a new department.

77.    The request was denied by Defendant Redmond, just as he had denied Mr. Williams's request to transfer.

78.    After Mr. Wynn threatened to file an EEOC complaint, Defendant Redmond granted the "transfer."

79.    In reality, however, Mr. Wynn was demoted to a department that did not offer the possibility of commissions, forcing him to accept a lower paid position in order to escape Defendant Corchado's racially charged conduct.

80.    Additionally, the Company continued to play the racially offensive music throughout the office, despite several new complaints from Mr. Wynn.

81.     In May 2019, Mr. Wynn was in a meeting with Defendant Redmond and was asked how the job was going.

82.    Mr. Wynn advised that he was still upset that Defendant Corchado was promoted to his immediate supervisor within days of calling him a "nigger", and was not adequately punished.

83.    Defendant Redmond advised that, as a consolation, he would look into increasing Mr. Wynn's salary because, "I don't want you to file suit against me, I have enough going on".

84.     In or around the end of June/beginning of July 2019, Mr. Wynn was called into another meeting with Defendant Redmond and the Floor Manager, "Brent".

85.     In that meeting, Defendant Redmond advised Mr. Wynn that, "Discrimination isn't high on my priority list," but stated that he would make it up to Mr. Wynn by providing an immediate pay increase and a promotion.

86.     The promotion and pay raise never came.

87.     During this time, Mr. Wynn also continued to complain to HR and Ms. Downing about the racially-charged music, as well as concerns he had about certain activities the Company was engaging in that he believed to be unlawful.

88.     On September 24, 2019, Mr. Wynn received an unsigned, unattributed letter from the Company terminating his employment due to Mr. Wynn allegedly "attempting [his] own form of vindication by trying to harm this Company . . . since an incident which occurred nine months prior was not handled to [his] subjective satisfaction".

89.     Through their conduct, Defendants Bene Market, Redmond, and Corchado violated 42 U.S.C. § 1981.

## COUNT I

### VIOLATION OF 42 U.S.C. § 1981: HOSTILE WORK ENVIRONMENT
### (Plaintiff v. Defendant Bene Market, LLC)

90.    The above paragraphs are incorporated below as if fully set forth at length below.

91.    42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

92.    Through the course of Plaintiff's employment, he was subjected to pervasive and regular harassment due to this race at the hands of Defendant Bene Market's employees.

93.    Said harassment was not welcomed by the Plaintiff.

94.    At all times material hereto, Defendant Bene Market was aware of said harassment but willfully failed to intervene.

95.    The harassment was so severe and pervasive that a reasonable person in Plaintiff's position would find his or her work environment to be hostile or abusive.

96.     Plaintiff believed his work environment to be hostile and abusive as a result of the conduct of Defendant Bene Market's employees.

97.     Defendant Bene Market failed to take reasonable steps to prevent harassment in the workplace, and to ensure that an adequate complaint-reporting system existed.

98.     As a result of the nonstop harassment, Plaintiff was constructively discharged from his employment with Defendant Bene Market.

99.     Through its conduct, Defendant Bene Market violated 42 U.S.C. § 1981.

100.   The conduct engaged in by Defendant Bene Market constitutes reckless indifference to the rights of Plaintiff sufficient to subject said Defendant to punitive damages.

101.   Plaintiff has been injured as a result of Defendant Bene Market, LLC's conduct in that he has suffered, and continues to suffer, lost wages, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, and psychological and emotional harm.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1981: RETALIATION
### (Plaintiff v. Defendant Bene Market, LLC)

102.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

103.   42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

104.   Throughout his tenure with Defendant Bene Market, Plaintiff made good faith complaints to his supervisors that Defendant Corchado was creating a hostile work environment and discriminating against him due to his race.

105.   Rather than remedy the discriminatory conduct by way of a departmental transfer for Plaintiff or discipline of Defendant Corchado, Defendant Bene Market rejected Plaintiff's request for a transfer and failed to discipline Defendant Corchado.

106.   Defendant Bene Market's refusal to transfer Plaintiff or discipline Defendant Corchado was retaliation for Plaintiff lodging complaints against Defendant Corchado.

107.   After several of these complaints went unaddressed, and having determined that the Defendant Bene Market had not made reasonable efforts to rectify the situation, Plaintiff resigned his position, which constitutes a constructive discharge.

108.   Through its conduct, Defendant Bene Market, violated 42 U.S.C. § 1981.

109.   The conduct engaged in by Defendant Bene Market constitutes reckless indifference to the rights of Plaintiff sufficient to subject said Defendant to punitive damages.

110.   Plaintiff has been injured as a result of Defendant's conduct in that he has suffered, and continues to suffer, lost wages, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

## COUNT III

### VIOLATION OF 42 U.S.C. § 1981: HOSTILE WORK ENVIRONMENT
### (Plaintiff v. Defendant Alan Redmond)

111.   The above paragraphs are incorporated below as if fully set forth at length below.

112.   42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

113.   Through the course of Plaintiff's employment, he was subjected to pervasive and regular harassment due to this race at the hands of Defendant Bene Market, LLC's employees.

114.   Said harassment was not welcomed by the Plaintiff.

115.   The harassment was so severe and pervasive that a reasonable person in Plaintiff's position would find their work environment to be hostile or abusive.

116.   Plaintiff believed his work environment to be hostile and abusive as a result of the conduct of Defendant Bene Market, LLC's employees.

117.   At all times material hereto, Defendant Redmond, was aware of said harassment but willfully failed to intervene.

118.   As a result of the nonstop harassment, Plaintiff was constructively discharged from his employment with Defendant Bene Market.

119.   Through his conduct, Defendant Redmond intentionally violated 42 U.S.C. § 1981.

120.   The conduct engaged in by Defendant Redmond constitutes reckless indifference to the rights of Plaintiff sufficient to subject said Defendant to punitive damages.

121.   Plaintiff has been injured as a result of Defendant Redmond's conduct in that he has suffered, and continues to suffer, lost wages, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, and psychological and emotional harm.

## COUNT IV

### VIOLATION OF 42 U.S.C. § 1981: RETALIATION
### (Plaintiff v. Defendant Alan Redmond)

122.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

123.   42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

124.   Throughout his tenure with Defendant Bene Market, LLC, Plaintiff made good faith complaints to Defendant Redmond and other supervisors that

Defendant Corchado was creating a hostile work environment and discriminating against him due to his race.

125.   Rather than remedy the discriminatory conduct by way of a departmental transfer for Plaintiff or discipline of Defendant Corchado, Defendant Redmond rejected Plaintiff's request for a transfer and failed to discipline Defendant Corchado.

126.   Defendant Redmond's refusal to transfer Plaintiff or discipline Defendant Corchado was retaliation for Plaintiff lodging complaints against Defendant Corchado.

127.   After several of these complaints went unaddressed, and having determined that the Defendant Redmond had not and would not make reasonable efforts to rectify the situation, Mr. Williams felt compelled to and did resign.

128.   Through his conduct, Defendant Redmond violated 42 U.S.C. § 1981.

129.   The conduct engaged in by Defendant Redmond, constitutes reckless indifference to the rights of Plaintiff sufficient to subject said Defendant to punitive damages.

130.   Plaintiff has been injured as a result of Defendant Redmond's conduct in that he has suffered, and continues to suffer, lost wages, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social

disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

## COUNT V

### VIOLATION OF 42 U.S.C. § 1981: HOSTILE WORK ENVIRONMENT
### (Plaintiff v. Defendant William Corchado, Jr.)

131.   The above paragraphs are incorporated below as if fully set forth at length below.

132.   42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

133.   Through the course of Plaintiff's employment, he was subjected to pervasive and regular harassment due to this race at the hands of Defendant Corchado.

134.   Said harassment was not welcomed by the Plaintiff.

135.   The harassment was so severe and pervasive that a reasonable person in Plaintiff's position would find his or her work environment to be hostile or abusive.

136.   Plaintiff believed his work environment to be hostile and abusive as a result of the conduct of Defendant Corchado.

137.   As a result of the nonstop harassment, Plaintiff was constructively discharged from his employment with Defendant Bene Market.

138.   Through his conduct, Defendant Corchado intentionally violated 42 U.S.C. § 1981.

139.   The conduct engaged in by Defendant Corchado constitutes reckless indifference to the rights of Plaintiff sufficient to subject said Defendant to punitive damages.

140.   Plaintiff has been injured as a result of Defendant Corchado's conduct in that he has suffered, and continues to suffer, lost wages, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social disruption, and psychological and emotional harm.

## COUNT VI

### VIOLATION OF 42 U.S.C. § 1981: RETALIATION
### (Plaintiff v. Defendant William Corchado, Jr.)

141.   Plaintiff hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

142.   42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make

and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

143.   Throughout his tenure with Defendant Bene Market, Plaintiff made good faith complaints to Defendant Redmond and other supervisors that Defendant Corchado was creating a hostile work environment and discriminating against him due to his race.

144.   As a result of said complaints, Defendant Corchado retaliated against Plaintiff by escalating his discriminatory and harassing conduct.

145.   As a result of Defendant Corchado's escalating conduct, and after several of Plaintiff's complaints went unaddressed, Plaintiff felt compelled to and did resign.

146.   Through his conduct, Defendant Corchado violated 42 U.S.C. § 1981.

147.   The conduct engaged in by Defendant Corchado constitutes reckless indifference to the rights of Plaintiff sufficient to subject said Defendant to punitive damages.

148.   Plaintiff has been injured as a result of Defendant Corchado's conduct in that he has suffered, and continues to suffer, lost wages, emotional distress, humiliation, embarrassment, anguish, personal hardship, career and social

disruption, psychological and emotional harm, economic losses, lost employment opportunities, and other such damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that a judgment be entered in his favor and against Defendants in the following respects:

a)      An order awarding damages on all counts herein, including punitive damages;

b)      An order awarding attorneys' fees and expenses on all counts herein;

c)      Pre-judgment interest; and

d)      All other relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

**Mobilio Law, LLC**

Date:   12-18-19              BY:   *s/ Matthew Mobilio*
                                    Matthew Mobilio, Esq. (I.D. No. 209439)
                                    609 W. Hamilton St., Suite 301
                                    Allentown, PA 18101
                                    Phone: (610) 882-4000
                                    Fax: (866) 793-7665
                                    matt@mobiliolaw.com

**Law Office of Peter C. Wood, Jr., PC**

BY:   *s/ Peter C. Wood, Jr.*_____
Peter C. Wood, Jr., Esq. (I.D. No. 310145)
1170 Route 315, Suite 1
Wilkes-Barre, PA 18702
Phone: (570) 234-0442
Fax: (570) 266-5402
peter@pcwlawoffice.com

*Co-Counsel for Plaintiff Terrell Williams*